**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | NO. 19-719 |
| | : | |
| SANTIAGO JEREZ | : | |

## MEMORANDUM

**KEARNEY, J.**                                                                                                                 **April 30, 2020**

      While investigating fentanyl drug trafficking in the Kensington area of Philadelphia, Drug Enforcement Agency agents arrested Santiago Jerez with two kilogram-size packages and other smaller packages of fentanyl, a Schedule II Controlled Substance. He now moves to suppress all physical evidence seized at the time of his stop and arrest. He argues the DEA agents never saw him before at the scene of the drug dealing at a Tacony property and then illegally arrested him without required probable cause and immediately engaged in a warrantless search to seize the physical evidence. The United States argues the agents engaged in a brief stop based upon reasonable suspicion of criminal activity after hours of surveillance and found the evidence as part of the stop and arrest shortly thereafter. The parties agreed to our review based on the submitted evidence including impounded investigative reports without an evidentiary hearing. After careful review of the submitted facts and applying settled principles of permissible seizures, we find the agents engaged in a short investigative stop supported by reasonable suspicion of criminal activity. We appreciate these encounters may quickly evolve from stop to arrest. But the evidence shows the agents stopped Mr. Jerez with reasonable suspicion of criminal activity and then discovered the evidence leading to the arrest. We deny Mr. Jerez's motion to suppress.

I.  **Facts adduced from submitted evidence.**

In late July 2019, the DEA debriefed a confidential informant who revealed information regarding a group selling heroin and fentanyl in the East Kensington section of Philadelphia.[1] The informant told the DEA she purchased heroin and fentanyl from this group in packages stamped "NASA" and "UBER."[2] The informant identified several people involved in the group's drug activities, including M.R., J.A, and C.S.[3]

*August 12, 2019 surveillance.*

On August 12, 2019, the DEA agents and local enforcement authorities conducted a controlled purchase of heroin from C.S.[4] During this controlled purchase, R.F. arrived to the sale driving a black Nissan and delivered the heroin.[5] The agents then began following R.F.[6] The agents observed R.F. enter a home.[7] Outside of the home, the agents observed a Mercedes registered to J.M.R.[8] R.F. left the home with a shoebox and then drove through Kensington before meeting with D.T.[9] After this meeting, the agents stopped D.T. and recovered 60 packets of heroin/fentanyl stamped "UBER."[10] D.T. admitted to purchasing the packets from R.F.[11] The agents confirmed R.F. and J.M.R.'s close relationship through social media research.[12]

*August 14, 2019 surveillance.*

On August 14, 2019, the DEA agents surveilled two locations: (1) J.M.R.'s address gathered from the Mercedes; and, (2) the same home R.F. exited two days earlier carrying a shoebox.[13] At J.M.R.'s address, they observed J.M.R.'s Mercedes and a Dodge Journey car registered to J.M.R.[14] At the second location, the DEA agents observed R.F. enter the house with a backpack and leave the house within ten minutes.[15] R.F. then drove to and parked on East Cambria Street.[16] Two men, J.G. and D.R., separately arrived near R.F.'s car and entered R.F.'s car.[17] J.G. exited within two minutes and left in his own car.[18] Agents stopped this car a short

distance away and recovered 15 packets of fentanyl.[19] These packets were also stamped "UBER."[20]

While agents stopped J.G., D.R. exited R.F.'s car holding a shoe box.[21] Agents followed D.R. and attempted a traffic stop.[22] D.R. fled from police at high speed, struck a pedestrian in a wheelchair, and was eventually arrested after exiting his car and attempting to flee on foot.[23] Agents recovered hundreds of bags of fentanyl from D.R. (some with the "UBER" stamp), as well as a stolen, loaded 9mm pistol.[24]

### *Investigation leads to Mr. Jerez's stop and arrest on August 21, 2019.*

On August 21, 2019, the DEA agents resumed surveillance at J.M.R.'s residence.[25] They observed both of the cars registered to J.M.R.—the Mercedes and the Dodge Journey—parked outside the house.[26] Both cars left the house around 12:15 p.m.; the agents followed J.M.R.'s Dodge Journey to an address in the Tacony section of Philadelphia, Northeast of Kensington ("Tacony house").[27]

Around 3:00 p.m. the DEA agents observed two Hispanic men park their Scion car near the Tacony house.[28] After the two men exited their vehicle, the agents observed them conduct counter surveillance.[29] After about thirty minutes, the agents observed these two men enter the Tacony house under surveillance.[30]

Around 5:00 p.m., the DEA agents observed an unidentified Hispanic male (now known to be Mr. Jerez) leave the Tacony house and return to the Tacony house after visiting a convenience store.[31] Over the next three hours, the DEA agents watched approximately five additional Hispanic men enter and exit the Tacony house.[32] Shortly after 8:00 p.m., agents saw a Hispanic man enter the Tacony house after briefly speaking to someone in an SUV up the street.[33] Within moments

of this man entering the residence, agents saw multiple people quickly leave the front and back doors of the house carrying bags and suitcases.[34]

The DEA Agents stopped Mr. Jerez and Miguel Vasquez walking together. According to the DEA log:

> Agents and officers identified Jerez SANTIAGO who was observed carrying a white paper shopping bag which contained two kilograms style packages (wrapped together) of suspected heroin/fentanyl (Exhibit 1) (approximately 2267 gross grams), which were concealed under several shirts in the bag but visible to officers. (Agents Note: Exhibit 1 was suspected heroin/fentanyl, however, a preliminary field test was performed at a later time and resulted in a positive indication for cocaine base). SANTIAGO was accompanied by Miguel VASQUEZ. It is noted that prior to the detention of SANTIAGO and VASQUEZ both individuals were looking around the area intently, as well as passing the white shopping bag and a large suitcase which was on wheels, back and forth between each other. SANTIAGO and VASQUEZ were also in possession of a multi-colored, plastic 'Ross' bag which contained other drug / non-drug exhibits as follows:
>
> • **Exhibit 2:** Described as three (3) clear bags containing a tan substance, alleged heroin (approximately 373 gross grams)
> • **Exhibit 3:** Described as five (5) clear knotted plastic bags, containing an off white powdery substance, alleged heroin (approximately 211 gross grams)
> • **Exhibit 4:** Described as six (6) clear knotted plastic bags, containing white poser and chunky white substance, alleged cocaine (approximately 945 gross grams)
> • **Exhibit 5:** Described as clear zip lock bag containing white, powder substance, unknown substance (approximately 173 gross grams).[35]

The DEA agents stopped Mr. Jerez and Miguel Vazquez at the scene.[36] The agents then submitted an affidavit for a search warrant to search the Tacony house swearing to a similar account.

The United States provides additional, uncontradicted evidence of the stop of Mr. Jerez.[37] One plain clothed DEA agent approached the Mr. Jerez and Miguel Vazquez. The agent did not draw his firearm. As the agent exited his car, he said, "Stop, police" to the two men. Two marked police cars arrived at this time. The DEA agent then took the shopping bag from Mr. Jerez and could feel, based on his training and experience, that the bag's contents were consistent with packaged controlled substances. When the DEA agent placed the bag on the ground, he was able

4

to see duct-taped packages which he recognized immediately as kilogram-style packages of controlled substances. The two packages were partially concealed under clothing. Based on this observation, the DEA agent then told other officers to place the two men in handcuffs. The DEA agent then performed additional searches incident to arrest, including discovering additional contraband in a plastic Ross Stores bag.

**II.     Analysis**

Our grand jury indicted Mr. Jerez for possession with intent to distribute 400 grams or more of a mixture and substance containing a detectable amount of fentanyl and aiding and abetting.  Mr. Jerez moves to suppress the fentanyl claiming DEA agents violated the Constitution during his arrest.  The United States opposes Mr. Jerez's motion.[38]

The Fourth Amendment prohibits "unreasonable searches and seizures."[39]  Santiago Jerez claims he was the victim of an unreasonable seizure and, as a result, requests we suppress all evidence seized from his person during his August 21, 2019 arrest.  Mr. Jerez argues "[t]here was insufficient information, indeed no information, that [he] was involved in the commission of a criminal offense" at the time of the stop.[40]  Mr. Jerez argues the agents placed him under arrest as soon as they confronted him and argues they lacked probable cause to arrest.[41]

The United States responds the DEA agents did not violate Mr. Jerez's constitutional rights during the arrest.  It maintains when the DEA agents confronted Mr. Jerez, they had requisite reasonable suspicion to perform a *Terry* stop-and-frisk, which developed into an arrest based on probable cause once the agents saw Mr. Jerez possessing drug packages in plain view.  The United States argues the totality of circumstances supported the DEA agents' reasonable suspicion of ongoing criminal activity and that Mr. Jerez was armed and dangerous to perform a pat down search for weapons.  Because the officers plainly viewed the drug packages during a justified stop

of Mr. Jerez, the United States argues we must deny Mr. Jerez's motion. We agree with the United States.

Our Court of Appeals instructs "police encounters with citizens fall into one of three broad categories, each with varying degrees of constitutional scrutiny: '(1) police-citizen exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions; and (3) full-scale arrests.'"[42] The first type of encounter does not implicate the Fourth Amendment.[43] The second category (i.e., brief seizures or *Terry* stops) requires a showing the officer acted with reasonable suspicion.[44] And the third category (i.e., full-scale arrests) is proper only when an officer has probable cause.[45] An officer may quickly develop reasonable suspicion or probable cause based on his or her observations during an encounter or stop.[46]

"The initial step in our suppression analysis is to determine whether a seizure has taken place and, if so, when the seizure occurred."[47] "A seizure occurs only 'when [a police officer], by means of physical force or show of authority, has in some way restrained the liberty of a citizen.'"[48] The United States does not contest the agents seized Mr. Jerez; it argues the agents had reasonable suspicion for the brief seizure or *Terry* stop.

We review when an officer has reasonable suspicion to stop an individual to determine if the DEA agents held a proper basis to seize Mr. Jerez. Reasonable suspicion is "a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence."[49] The officer must simply have some objective justification for the stop and must be able to articulate more than an "unparticularized suspicion or 'hunch'" the suspect is engaged in criminal activity.[50] When making reasonable suspicion determinations, we "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing."[51] "This process allows officers to draw on

6

their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'"[52] We "give considerable deference to police officers' determinations of reasonable suspicion."[53]

In certain situations, the reasonable suspicion of one officer may be transferred to another officer under the "collective knowledge" doctrine.[54] Our Court of Appeals deems it proper to apply this doctrine in a "fast paced, dynamic situation" where officers "worked together as a unified and tight-knit team."[55]

When a police officer has "a reasonable, articulable suspicion that criminal activity is afoot," he or she may conduct a "brief, investigatory stop."[56] "When an officer is justified in believing that the individual whose suspicious behavior he is investigating ... is armed and presently dangerous to the officer or to others, it would ... be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm."[57]

We apply these principles to determine whether the DEA agents who stopped Mr. Jerez held the requisite reasonable suspicion. We consider the totality of the circumstances. We consider the facts leading the agents to surveil the home where they observed Mr. Jerez, and we defer to the officers' determinations.

The DEA began this investigation in late July 2019 after receiving information from a confidential informant. The informant revealed information about a drug trafficking group in the East Kensington area of Philadelphia. The DEA conducted a controlled purchase corroborating much of information gleaned from the informant, including some members of the group and the particular "stamp" used by this group on their drugs, "UBER." During the controlled purchase, the DEA observed R.F. procure the drugs for the sale and, after this sale, enter a home where

J.M.R.'s Mercedes was parked outside.  R.F. then exited this home with a shoebox and proceeded to sell sixty packets of heroin/fentanyl to D.T. who admitted to the purchase once arrested.  The DEA later confirmed a close relationship between R.F. and J.M.R.

Two days after the controlled purchase and admission from D.T., the DEA agents surveilled J.M.R.'s home and identified a Dodge Journey also belonging to J.M.R.  Later in the day, the DEA observed two individuals make bulk purchases of heroin from R.F.  They stopped and arrested both buyers—each in possession with heroin stamped with the "UBER" logo—and discovered one of these individual's possessed a stolen, loaded 9mm pistol.

Five days later on August 21, the agents resumed surveillance at J.M.R.'s house.  The agents followed J.M.R.'s Dodge Journey to the Tacony house.  By this time, the DEA had connected J.M.R.'s vehicles to the group's operations and had confirmed R.F. and J.M.R.'s friendship.  Surveilling the Tacony house, the agents observed two individuals conduct counter surveillance before entering.  They observed a consistent flow of persons into and out of the residence for approximately three hours.  They observed one of the men reenter the home after briefly speaking to someone in an SUV up the street.  Within moments of this man reentering the house, agents saw multiple people quickly leave the front and back doors of the Tacony house carrying bags and suitcases.  The DEA agents observed two of the men who had just left the house—Mr. Jerez, together with Mr. Vazquez—nervously looking around with bags and suitcases while walking down the street.  They confronted the men up the street and identified themselves as police.  The DEA agents stopped Mr. Jerez.

The totality of the circumstances supports reasonable suspicion to stop Mr. Jerez as he walked outside the Tacony house with bags and suitcases.  The agents had a basis to connect Mr. Jerez to the group of drug traffickers by following the Dodge Journey to the Tacony house.  At the

Tacony house, the agents observed activities consistent with drug trafficking, including observing two men enter the home after conducting counter surveillance and a steady flow of men entering and exiting the house. The agents observed one man enter the home after speaking to a man in an SUV. And, shortly after he entered, many of the individuals in the home left carrying bags and suitcases. Two of these men, Mr. Jerez and Miguel Vazquez, held bags and suitcases while looking around nervously.[58] The DEA agents observed this conduct in a high crime area.[59] Based on the totality of the circumstances, the agents detaining Mr. Jerez held a particularized and objective basis for suspecting legal wrongdoing.[60]

The DEA agents also had reasonable suspicion Messrs. Jerez and Vazquez may have been armed and dangerous. Less than a week earlier, they observed an individual buy drugs from this group who fled when agents attempted to stop him and who carried a stolen, loaded 9mm pistol. On the day of Mr. Jerez's arrest, the agents followed a car they had connected to the group's activities to the Tacony house. There, the agents saw more activities consistent with drug trafficking. By the time the agents confronted Mr. Jerez, they held concrete facts (1) connecting Mr. Jerez to the group in which at least some participants carry loaded weapons, and (2) confirming a suspicion Mr. Jerez was engaging in drug trafficking. "Because drug dealers often carry guns," and, in fact had during the course of this particular investigation, "the officers had 'a reasonable belief based on specific and articulable facts'" that Mr. Jerez was armed and dangerous.[61]

Mr. Jerez does not specifically challenge the scope of the pat down for weapons. According to uncontradicted evidence submitted by the United States, when the agents conducted the pat down for weapons, they took the white paper bag in Mr. Jerez's hand and, without examining the contents, placed it on the ground. While placing the white bag on the ground, the agents could plainly see and/or feel packages that in their experiences appeared to be large

9

packages of a controlled substance. Once the officers plainly viewed and/or felt these packages, they held the requisite probable cause to arrest and perform additional searches of Mr. Jerez incident to arrest.[62] These searches revealed additional packages of drugs on Mr. Jerez's person.

The agents initially stopped Mr. Jerez based on reasonable suspicion based on the circumstances of the past several hours of surveillance at the Tacony house after over a week of surveillance and admitted criminal conduct involving drugs and guns involving this same group. The DEA agents were presented with a fast-paced, dynamic situation warranting application of the collective knowledge doctrine.[63] Mr. Jerez fails to present evidence they immediately arrested or intended to arrest Mr. Jerez. The DEA agents remained within the bounds of a *Terry* stop-and-frisk based upon reasonable suspicion until one agent plainly viewed and/or plainly felt the contraband. As the agent had not exceeded the scope of a *Terry* stop-and-frisk when plainly viewing and/or plainly feeling the contraband, he acted within the bounds of law when forming a proper probable cause basis to arrest Mr. Jerez for possession of a controlled substance. The circumstances justified both the stop and seizure of the physical evidence. We find no constitutional violation. We deny Mr. Jerez's motion to suppress.

### III. Conclusion

Finding no grounds to suppress, we deny Mr. Jerez's motion in the accompanying Order.

---

[1] ECF Doc. No. 37, at p. 1. We temporarily sealed this evidence as the United States continues this investigation.

[2] *Id.*

[3] *Id.*

[4] *Id.* We refer to the law enforcement officials as "DEA agents" but understand the DEA collaborated with other law enforcement agencies, including at the local level, in carrying out its investigation.

[5] *Id.* at p. 3.

---

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] *Id.* at p. 2.

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.* at p. 4.

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] *Id.* at pp. 4–5.

[28] *Id.* at p. 5.

[29] *Id.*

[30] *Id.*

---

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] *Id.* at p. 24.

[37] ECF Doc. No. 30, at p. 5.

[38] ECF Doc. No. 30. In opposing the motion, the United States submitted evidence, ECF Doc. No. 37, which we, as noted above, temporarily sealed absent objection while the United States continues its investigation.

[39] U.S. Const. amend. IV.

[40] ECF Doc. No. 29, at p. 3.

[41] *Id.* at p. 4 ("Defendant's arrest was not preceded by any confidential information specific to him, or any observed criminal activity on his part, nor did the police possess any information that the defendant was committing a crime. Perhaps a brief stop of the defendant in order to determine his identity or to maintain the status quo momentarily would have been within constitutional bounds, but not an arrest.").

[42] *United States v. Brown*, 765 F.3d 278, 288 (3d Cir. 2014) (quoting *United States v. Perez*, 443 F.3d 772, 777 (11th Cir. 2006)).

[43] *Id.* (citing *United States v. Williams*, 413 F.3d 347, 352 (3d Cir. 2005)).

[44] *Id.* (citing *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000); *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).

[45] *Id.* (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).

[46] *United States v. Edwards*, 53 F.3d 616, 618 (3d Cir. 1995).

[47] *Brown*, 765 at 288 (citing *United States v. Torres*, 534 F.3d 207, 210 (3d Cir. 2008); *Johnson v. Campbell*, 332 F.3d 199, 205 (3d Cir. 2003)).

[48] *United States v. Crandell*, 554 F.3d 79, 84 (3d Cir. 2009) (quoting *Terry*, 392 U.S. at 19–20 n.16).

[49] *Brown*, 765 F.3d at 290 (quoting *Wardlow*, 528 U.S. at 123).

[50] *Id.* (quoting *Wardlow*, 528 U.S. at 124).

[51] *Id.* (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)) (additional citations omitted).

[52] *Id.* (quoting *United States v. Cortez*, 449 U.S. 417, 418 (1981).

[53] *Id.* (quoting *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006)).

[54] *See, e.g., United States v. Whitfield*, 634 F.3d 741 (3d Cir. 2010).

[55] *Id.* at 746.

[56] *Id.* at 744 (quoting *Wardlow,* 528 U.S. at 123).

[57] *United States v. Johnson*, 592 F.3d 442, 448 (3d Cir. 2010) (quoting *Terry*, 392 U.S. at 24).

[58] *Wardlow*, 528 U.S. at 124 (recognizing presence in a "high crime area," "unprovoked flight," and "nervous, evasive behavior" as factors supporting a reasonable suspicion).

[59] *Id.* (noting that location in a high crime area is "among the relevant contextual considerations" in determining the reasonableness of a stop).

[60] Mr. Jerez's argument the officers did not previously identify him in the investigation, of course, cannot defeat the reasonable suspicion the officers held by stopping him based on the evidence they observed throughout the investigation (including the seizure of large quantities of drugs and a loaded firearm) which lead them to the Tacony house on August 21, 2019 where they observed more evidence suggestive of drug trafficking before observing Mr. Jerez exit the house with bags and suitcases.

[61] *United States v. Davis*, 726 F.3d 434, 440 (3d Cir. 2013) (quoting *Wardlow*, 528 U.S. at 124).

[62] Mr. Jerez does not specifically challenge the scope of the search incident to arrest.  A search incident to arrest is well-recognized exception to the warrant requirement of the Fourth Amendment providing: "[w]hen an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape*." United States v. Shakir*, 616 F.3d 315, 317 (3d Cir. 2010) (quoting *Chimel v. California*, 395 U.S. 752, 762–63 (1969)). The permissible scope of a search incident to arrest includes "the arrestee's person and the area 'within his immediate control'— construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." *Id.* (quoting *Chimel*, 395 U.S. at 763).  Our Court of Appeals recognized the Supreme Court limited the scope of a search incident to arrest in the Court's 2009 decision *Arizona v. Gant*. *Id.* at 318 (citing *Arizona v. Gant*, 556 U.S. 332 (2009)).  Even after *Gant*, our Court of Appeals has held "that a search is permissible incident to a suspect's arrest" even when a suspect is handcuffed "when, under all the circumstances, there remains a reasonable possibility that the arrestee could access a weapon or destructible evidence in the container or area being searched."  *Id.* at 321.   Our Court of Appeals reasoned a handcuffed suspect may still access a weapon because of faulty handcuffs, while the officers may face other risks warranting a search.  *Id.*  Thus, while DEA agents effected an additional search incident to arrest after handcuffing Mr.

13

Jerez, we have no basis but to conclude the agents had a reasonable probability that Mr. Jerez could have accessed a weapon in the bags searched after his arrest.

---

[63] *Whitfield*, 634 F.3d at 746.